**SIGNED THIS: February 21, 2014**

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: ) | | |
| DAVID L. DUCKWORTH, ) | | Case No. 10-83603 |
| Debtor. ) | | |
| ) | | |
| ) | | |
| STATE BANK OF TOULON, ) | | |
| Plaintiff, ) | | |
| ) | | |
| vs. ) | | Adv. No. 12-08067 |
| ) | | |
| MICHLIG AGRICENTER GRAIN, LLC, ) | | |
| MICHLIG AGRICENTER, INC., and ) | | |
| CHARLES E. COVEY, Chapter 7 Trustee ) | | |
| for DAVID L. DUCKWORTH, ) | | |
| Defendants. ) | | |

**O P I N I O N**

This matter is before the Court on cross-motions for summary judgment filed by the Plaintiff, State Bank of Toulon (SBT), and by each of the Defendants, Michlig Grain Holdings, LLC, f/k/a Michlig Agricenter Grain, LLC and Michlig Holdings, Inc., f/k/a

Michlig Agricenter, Inc. (collectively referred to as "Michlig") and Charles E. Covey (TRUSTEE), as Chapter 7 Trustee for the estate of the Debtor, David L. Duckworth (DEBTOR). In its amended complaint to determine validity, priority and extent of liens, brought pursuant to Bankruptcy Rule 7001(2), SBT seeks a determination that it has a first priority security interest in proceeds from the sale of the DEBTOR'S 2010 crop, which have been retained by Michlig, pursuant to a stipulation entered into between the parties, and seeks turnover of those funds. The TRUSTEE filed a counterclaim to avoid SBT's security interest and seeks summary judgment on that claim. The TRUSTEE asserted a cross-claim against Michlig for turnover of the proceeds. In response, Michlig has asserted a right of setoff to the funds, which is the central issue addressed herein.

## JURISDICTION

This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(K), because it involves the determination of the validity, extent, or priority of liens. It is also a matter concerning the TRUSTEE'S administration of the estate and involves the allowance or disallowance of claims against the estate, so it is core under 28 U.S.C. § 157(b)(2)(A) and (B) as well.

## FACTUAL BACKGROUND

The DEBTOR, a farmer, filed a chapter 7 petition on November 23, 2010. Prior to filing bankruptcy, the DEBTOR had a lending relationship with SBT, which involved a number of loans, both operating and equipment loans. In December, 2008, the DEBTOR obtained a large operating loan from SBT, signing a Promissory Note dated December 15,

2008, evidencing an open-end revolving line of credit loan of $1,100,000 with fixed rate interest at 5.75%. The Note requires a single, interest-only payment due on April 1, 2009, with payment of the entire balance due on April 1, 2010. On the second page of the Note, in the paragraph headed "collateral," it provides as follows:

> Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008 AND A MORTGAGE FROM DONALD R. DUCKWORTH, AS TRUSTEE OF THE DONALD R. DUCKWORTH LIVING TRUST TO THE STATE BANK OF TOULON DATED DECEMBER 15, 2008.

The DEBTOR also signed an Agricultural Security Agreement (ASA) dated December 13, 2008. The ASA describes the collateral as "All Inventory, Chattel Paper, Accounts, Equipment, General Intangibles, Crops, Farm Products, Livestock (including all increase and supplies) and Farm Equipment." SBT filed a UCC Financing Statement containing a lengthy description of the collateral. The ASA misidentifies the secured Note as being dated December 13, 2008, rather than December 15, 2008.

A second large operating loan was made by SBT to the DEBTOR in January, 2010. The DEBTOR signed a Promissory Note in the amount of $950,000 dated January 29, 2010, evidencing an open-end line of credit for the purpose of paying "farm operating expenses only," with full payment due on July 1, 2010. The paragraph headed "Collateral" provides that "Borrower acknowledges this Note is secured by SECURITY AGREEMENT DATED DECEMBER 13, 2008."

SBT attempted to comply with the notice requirements of the Food Security Act. On September 8, 2010, SBT sent Michlig a "Notice to Buyer of Security Interest in Farm Products," which contained, in addition to the names of other farmers or producers, the

3

DEBTOR'S name, but did not specify the county in which the DEBTOR'S farm products were produced or located.[1]

Prior to bankruptcy, the DEBTOR had entered into several contracts to sell grain to Michlig. Two contracts are in dispute here which, on their face appear to be cash forward, fixed price agreements.[2] The contract dated December 1, 2009, evidences the sale of 10,000 bushels of #2 yellow corn at $4.30 per bushel for delivery in December, 2010. The contract dated January 6, 2010, evidences the sale of 30,000 bushels of #2 yellow corn at $4.28 per bushel also for delivery in December, 2010. Both contracts expressly incorporate by reference the National Grain and Feed Association (NGFA) Trade and Arbitration Rules. Neither contract contains or refers to remedies for default, damages or penalties.

Michlig had done business with the DEBTOR for a number of years before he filed bankruptcy. Michlig not only bought the DEBTOR'S grain, but sold him inputs and crop insurance as well. Michlig was aware that SBT had a lien on the DEBTOR'S grain and had a history of cutting two-party checks when purchasing the DEBTOR'S grain, adding SBT as a joint payee.

The DEBTOR filed a Chapter 7 petition on November 23, 2010. It is undisputed that at that time, the contract for the sale of 10,000 bushels of corn was wholly unperformed by the DEBTOR. The contract for 30,000 bushels had been partially performed. The DEBTOR

---

[1] A similar notice was sent by SBT to Michlig on September 3, 2009.

[2] A cash forward contract allows a farmer to lock in a price now for the sale of grain to be delivered in the future. Unlike futures contracts, cash forward agreements contemplate the eventual, actual delivery of the commodity at a future date. *Lachmund v. ADM Investor Services, Inc.,* 191 F.3d 777 (7th Cir. 1999); *Salomon Forex, Inc. v. Tauber,* 8 F.3d 966, 971 (4th Cir. 1993).

4

had delivered 15,789.30 bushels of corn, but did not receive payment from Michlig.[3]

The day after the filing of the Chapter 7 petition, SBT sought relief from the stay to repossess and sell its collateral. An order was entered on January 11, 2011, authorizing SBT to liquidate all of the non-grain property and directing it to hold the proceeds pending further order of the Court. The order directed that the grain be sold free and clear of liens, with the liens to attach to the proceeds and the proceeds to be held by the TRUSTEE, pending further order of the Court. Within days, SBT removed the grain from the DEBTOR'S farm and completed the sale.

Thus the month of December following the filing of the petition, the month for scheduled delivery under both contracts, passed without any further delivery of corn by the DEBTOR. In January, 2011, Michlig received word that the corn remaining on the DEBTOR'S farm was being hauled away. Based on the DEBTOR'S nondelivery in December and the belief that no further grain would be delivered, Michlig cancelled the contracts as permitted by section 556 of the Bankruptcy Code and pursuant to NGFA Rule 28(A)(3), which allows a buyer to "cancel the defaulted portion of the contract at fair market value based on the close of the market the next business day."

Michlig proceeded to net out the termination value or payment amount (*see* section 362(b)(6)) using the January 10, 2011, closing price for corn of $5.72 per bushel and also assessed a $0.05 cancellation fee for each undelivered bushel. The termination value for the

---

[3]The grain tickets attached to Stoller's deposition transcript evidence the delivery by the DEBTOR to Michlig of 15,789.30 bushels of #2 yellow corn in October, 2010. These deliveries are expressly identified to contract number 001-0138780, which is the contract dated January 6, 2010, for the sale of 30,000 bushels of corn. Any representations in the pleadings that the DEBTOR delivered corn for credit to that contract to an ethanol plant are refuted by the grain tickets and by Stoller's testimony.

5

December 1, 2009, contract for 10,000 bushels of corn, all undelivered, included $14,200 for the price difference plus $500 for the cancellation fee for a total of $14,700.

The January 6, 2010 contract for 30,000 bushels of corn had been partially performed, the DEBTOR having previously delivered 15,789.30 bushels, leaving 14,210.70 undelivered bushels. The termination value was determined by Michlig to include $20,463.41 for the price difference on the undelivered grain, plus $710.54 for the cancellation fee for a total of $21,173.95. At the contract price of $4.28 per bushel, Michlig owed $67,578.20 for the 15,789.30 bushels actually delivered. If Michlig had completed the netting out process for the January 6, 2010 contract, it would have subtracted $21,173.95 from $67,578.20, resulting in a net sum of $46,404.25 due the DEBTOR.

Michlig filed a proof of claim on April 15, 2011, for $35,873.96, as secured, attaching the following explanation.

> [Claim] is based upon the default of DEBTOR under [two grain contracts]. The total of nondelivery was 24,210.70 bushels. The amount of the damages arising from the breach of those contracts was $35,873.96.
>
> [Michlig] has a secured right of setoff against grain proceeds it holds for the amount of the damages arising from this breach.

In a separate adversary proceeding brought by SBT, the TRUSTEE asserted a turnover claim against Michlig, alleging that it was in possession of crops or the cash proceeds of crops.[4] In response, Michlig raised its right of setoff against the crop proceeds. A stipulation was entered into by the parties to that proceeding, whereby Michlig turned over $363,135.58 to the TRUSTEE, which represented the proceeds from the sale of the DEBTOR'S 2010 crop, less the sum of $35,873.96, which Michlig asserted it had priority in

---

[4]Adv. No. 11-8002.

pursuant to its secured setoff rights.

In that same adversary proceeding, brought by SBT to determine the validity, priority, and extent of its claimed liens against the estate, this Court, ruling on motions for partial summary judgment filed by SBT and the TRUSTEE, determined that SBT's security agreement, although mistakenly identifying the date of the Note as December 13, 2008, was effective to secure the debt evidenced by the December 15, 2008 Note.[5] The Court concluded that all of the evidence in the record demonstrated that both the DEBTOR and SBT intended the debt evidenced by the Note to be secured by that security agreement. Appeals of that decision by SBT, the TRUSTEE and Michlig, were dismissed by the district court for lack of jurisdiction. Noting that third-party claims, cross-claims and counter-claims filed by the TRUSTEE remained to be resolved by this Court in that adversary proceeding, as well as a second adversary proceeding brought by SBT seeking to establish its secured status as to certain excess equipment proceeds, the district court determined that the order was not final and declined interlocutory review as inappropriate under the circumstances of the case.

The TRUSTEE and SBT responded by severing out most of the unresolved claims and obtaining orders on the remaining claims in the adversary proceeding. Thereafter, the TRUSTEE, on May 10, 2013, again appealed this Court's order entered March 22, 2012.[6]

---

[5]*State Bank of Toulon v. Charles E. Covey, Trustee, et al.*, 2012 WL 986766 (Bankr.C.D.Ill. 2012)(issued March 22, 2012).

[6]That order was modified on February 21, 2013, to enter summary judgment in favor of SBT on Count XXVI of the TRUSTEE'S counterclaim to recover SBT's setoff of a $22,913.73 balance in the DEBTOR'S checking account, based on its prior determination that SBT had a valid, perfected security interest in the funds. The Court had not ruled on that claim in issuing its opinion, but, as acknowledged by the TRUSTEE, the result follows directly from that ruling. The appeal was taken from the order, as modified.

This Court, in its first Opinion, held that the second Note, dated January 29, 2010, was not secured by the security agreement, which did not contain a provision for securing future debts. The reference to the security agreement in the second Note was ineffective to overcome the omission of a future advances or dragnet clause in the security agreement. That ruling has not been challenged in the appeal which is currently before the district court.

7

Meanwhile, on January 18, 2013, this Court issued its ruling in the second adversary proceeding brought by SBT, Adv. No. 11-8037, relating to the excess proceeds from the sale of equipment, reaffirming its earlier ruling that the security agreement secured the December 15, 2008 Note and determining that the proceeds were SBT's collateral. The TRUSTEE has appealed that ruling and the matter is also before the district court. Both of those appeals test the validity of SBT's security interest.

The only other remaining adversary proceeding, Adv. No. 12-8072, was created from claims severed from the original adversary, and involves claims by the TRUSTEE against Michlig, to avoid transfer of certain crop insurance policies and security interests by the DEBTOR to Michlig as either preferential or fraudulent transfers.[7] In addition, the TRUSTEE seeks to avoid a transfer of $233,825.10 by the DEBTOR to Michlig within 90 days of the bankruptcy. Michlig has raised the affirmative defenses of ordinary course of business and new value and asserts that if SBT is determined to have a perfected security interest in the 2010 crops, the transfer may not be subject to avoidance by the TRUSTEE. Michlig and the TRUSTEE have agreed to continue the matter until the appeals pending before the district court have been resolved.

SBT filed this proceeding, seeking a determination that it holds a first lien in the 2010

---

[7]The claims, as transferred, originally included the TRUSTEE'S claim against Michlig for turnover of the remaining crop proceeds, which is the subject of this adversary proceeding. The TRUSTEE'S motion to dismiss that claim, based on the duplication, was granted by the Court.

The Court is uncertain of the status of the claims against Michlig, based upon the DEBTOR'S transfers of crop insurance policy nos. 992715 and 9992716, issued by Rural Community Insurance Company d/b/a Rural Community Insurance Services. After the claims under the two federal crop insurance policies were denied, the TRUSTEE filed a complaint in this Court, Adv. No. 12-8052, seeking review of that administrative determination. This Court dismissed the complaint, determining that it is required to be filed in the district court, not the bankruptcy court. The Court is unaware of any further action which the TRUSTEE may have taken.

8

crop proceeds being retained by Michlig and for turnover of those funds.[8] Both the TRUSTEE and Michlig assert competing claims to those funds. Each of the parties have filed motions for summary judgment.

## ANALYSIS

SBT, relying on this Court's earlier decision determining that the agricultural security agreement secures the 2008 Note, asserts that it has a prior, perfected security interest in the 2010 crops, which is superior to Michlig's right of setoff. Both the TRUSTEE and Michlig maintain that SBT had no lien in the proceeds based on the mistake in the description of the December 15, 2008 Note in the security agreement. Alternatively, the TRUSTEE contends that even if the security agreement is subject to "reformation" between the parties, SBT's lien is avoidable by him, and, taking SBT's place in the dispute with Michlig, argues that a perfected security interest trumps an unsecured right of setoff.[9] Third, the TRUSTEE contends that he prevails over Michlig based on a concession made early on in the case that its right of setoff arose postpetition. Michlig now maintains that its setoff claim involves prepetition obligations. The issues of the effectiveness of the security agreement to secure the 2008 Note and avoidability of the transfer effected by the security agreement by the TRUSTEE are currently before the district court on appeal. Unless this Court's decisions are vacated or reversed, those decisions remain the law of the case for purposes of this adversary proceeding.

As a preliminary matter, the TRUSTEE continues to mischaracterize the Court's

---

[8] According to SBT, after receiving various payments, the unpaid principal balance on the 2008 Note is $118,124.94.

[9] This Court, in its opinion concerning the surplus equipment proceeds, reiterated that its earlier ruling had nothing to do with a "reformation" of the security agreement, noting that reformation may only be sought by one party to an instrument against the other to correct misstated or omitted terms. The TRUSTEE'S reformation argument is a red herring that misconstrues this Court's reasoning and the basis for its decision.

9

earlier decisions as involving a reformation of SBT's security agreement. To the contrary, this Court expressly rejected the proposed application of the common law doctrine of reformation. This Court held that SBT's security agreement was valid and enforceable to secure the loan evidenced by the December 15, 2008 Note, notwithstanding that the agreement misidentified the date of the Note and notwithstanding that judicial reformation had neither been sought nor obtained by SBT prior to the DEBTOR'S bankruptcy filing. Since the mistatement of the date of the Note was a clerical error that did not impact the performance or the enforcement of the security agreement as between SBT and the DEBTOR, there was no need to correct or reform the document as a precondition to the effectiveness of the lien.[10] As a matter of the law of secured transactions, the security agreement as it was written operated to create a valid and enforceable security interest that was effective between the DEBTOR and SBT and effective against third parties, when the loan closed in December, 2008. Any suggestion that this Court "reformed" the security agreement is simply not true.

As a second preliminary matter, Michlig requests that this Court defer its ruling in this matter, given the pending appeal of some of the same issues raised in this case. Correctly assuming that this Court will adhere to its previous ruling, that SBT has a valid security interest in the 2010 crop proceeds, Michlig contends that it should not be put to the burden of pursuing yet another appeal of that issue. Michlig expresses concern that should the district court reverse this Court's ruling and determine that SBT does not have

---

[10]There was only one loan made by SBT to the DEBTOR in December, 2008 and both parties intended that loan be secured by the security agreement executed contemporaneously with the note.

a valid security interest, it could not prevail on its motion for summary judgment in this case. SBT opposes Michlig's request that this proceeding be held in abeyance, noting that three years have passed since the filing of the bankruptcy petition. The TRUSTEE also opposes Michlig's request, characterizing the issue of its right of setoff as necessary to be decided, whether that right is pitted against SBT or the TRUSTEE. This Court agrees that the "setoff issue" is a discrete issue that may be addressed while the appeals are pending.

The setoff issue is before the Court on three cross-motions for summary judgment. Each movant claims an entitlement to judgment as a matter of law, based upon undisputed facts. In this Court's view, the most important facts concern the interpretation of the January 6, 2009 contract for the sale of 30,000 bushels of corn. More specifically, one critical inquiry is what right to payment, if any, as a matter of Illinois law, did the DEBTOR have under that contract when he filed his bankruptcy petition. None of the parties directly address this issue.

The only deposition testimony presented is that of Scott Stoller, an experienced grain merchandiser and former employee of Michlig, whom the parties apparently have relied upon for his industry knowledge and expertise without actually tendering him as an expert witness. Stoller's deposition testimony is full of holes, however, due to unasked questions. Stoller was never asked directly to give an expert opinion about a grain buyer's payment obligation under a partially performed cash forward contract. He was never asked to address Michlig's payment obligation to the DEBTOR as of the date of bankruptcy. Stoller did testify about how Michlig calculated the termination value of the two contracts, but while the actions taken by a party to enforce a contract are circumstantial

11

evidence of that party's understanding of what its rights are, one party's understanding is not determinative.

The record contains no testimony from Michlig's counterparty, the DEBTOR. Moreover, the cryptic grain contracts are obviously not integrated contracts. They contain terms of art and shorthand references, the full meaning of which is opaque to the non-expert. Non-integrated contracts may be subject to clarification and supplementation based upon industry custom as well as the parties' course of dealing and course of performance. *See NanoeXa Corp. v. University of Chicago,* 2011 WL 1399264 (N.D.Ill 2011) (to clarify contract ambiguity, appropriate extrinsic evidence includes industry custom, course of dealing and course of performance). Evidence of custom and usage of the trade is usually and preferably supplied by disinterested expert witnesses. *See Home Ins. Co. v. Chicago & Northwestern Transp. Co.,* 56 F.3d 763, 768-69 (7th Cir. 1995)

Although it may reasonably be inferred from Stoller's testimony that Michlig acted in accordance with industry customs and standards, the Court is not permitted to grant summary judgment in favor of Michlig at this stage where inferences must be drawn against each movant. A trial court presented with cross-motions for summary judgment must consider each motion separately and draw all reasonable inferences against the party whose motion is under consideration. *Rowe Intern. Corp. v. Ecast, Inc.,* 586 F.Supp.2d 924, 930 (N.D.Ill. 2008).

As a threshold matter, the parties fail to address the effect of section 541(a) of the Bankruptcy Code. Under that section, the estate takes ownership of a debtor's assets,

including contract claims, but has no greater rights than the debtor possessed at the time of the filing. *In re Majestic Star Casino, LLC,* 716 F.3d 736, 748 (3d Cir. 2013); *Matter of Sanders,* 969 F.2d 591, 593 (7th Cir. 1992) (a trustee takes the debtor's property subject to the same restrictions and limitations that existed at the commencement of the case); *In re South Side House, LLC,* 474 B.R. 391 402 (Bankr.E.D.N.Y. 2012) (estate takes property interests subject to the conditions under which debtor held the interest). Contract claims held by the debtor at the time of filing are acquired by the trustee subject to any conditions and unperformed obligations of the debtor as are contained in the contract. *In re Tomer,* 128 B.R. 746, 756-58 (Bankr.S.D.Ill. 1991). Where a bankruptcy trustee takes rights subject to contingencies, the trustee must wait for the unfolding of future events to know what, if anything, those rights are worth. *In re Ruetz,* 317 B.R. 549, 553 (Bankr.D.Colo. 2004).

Stoller's testimony supports the inference that on November 23, 2010, the DEBTOR had no present right to payment under either grain contract. From his testimony, the general industry standard may be inferred that a buyer has no obligation to make an advance or "partial" payment to a producer who delivers grain where the delivery is of less than all bushels due under the contract. It may also be inferred that where full delivery is never made and the buyer cancels a cash forward contract, the amount owed for the grain actually delivered is determinable only by netting out or deducting the per bushel price difference where the contract price is less than the current spot price (per NGFA Rule 28(A)) plus a $0.05 per bushel cancellation fee (per industry custom?). According to Stoller's testimony, the amount a producer is owed for grain delivered under a partially performed, but later cancelled, cash forward contract is not determined simply by

13

multiplying the bushels delivered by the per bushel price stated in the contract. That is only one-half of the equation. Nothing in the record supports the conclusion that Michlig's obligation to pay for the grain actually delivered is an independent obligation that is severable from the rest of the contract. The evidence in the record supports the conclusion that it is not severable. The estate took ownership of a contract claim against Michlig, the value of which was correctly determined by Michlig in January, 2011, if Stoller is to be believed.

Based on the inferences reasonably drawn from Stoller's testimony, it would appear that the DEBTOR'S, and thus the TRUSTEE'S, contract rights against Michlig were subject to the netting process performed by Michlig in January, 2011.[11] To the extent the TRUSTEE takes the position that Michlig had a severable obligation to pay the DEBTOR under the January 6, 2010 contract, for the grain actually delivered at the stated contract price, regardless of the post-bankruptcy default, that position is not supported and is indeed refuted by Stoller's testimony. As indicated above, however, those inferences, favorable to Michlig, may not be drawn for purposes of its motion for summary judgment.

At his deposition, Stoller was not asked to explain why Michlig filed a proof of claim that combined both the December 1, 2009 and January 6, 2010 contracts, although the proof of claim effected a setoff between the contracts. From his testimony and the contracts themselves, however, it is clear that the two contracts are not related, but are independent agreements. It is undisputed that the DEBTOR made no deliveries under the December 1,

---

[11]Although the parties don't address it, Section 556 provides that the contractual right of a forward contract merchant to cause the liquidation, termination, or acceleration of a commodity contract or forward contract because of, among other things, the producer's bankruptcy filing, shall not be stayed, avoided, or otherwise limited by any bankruptcy code provision or order of the bankruptcy court. Section 362(b)(6) provides that the right of a forward contract merchant to net out contracts with bankrupts is not stayed.

14

2009 contract. So the settlement calculation for that contract is simply a one-sided computation that adds the price difference amount of $14,200 plus the cancellation fee of $500 to yield a sum of $14,700 due from the DEBTOR to Michlig, with no offsetting obligation owed by Michlig.

The settlement calculation for the January 6, 2010 contract, under which some deliveries were made, is two-sided. The amount of $21,173.95 resulting from the grain not delivered must be netted against the amount of $67,578.20 for the delivered grain, yielding a net amount of $46,404.25 owed by Michlig to the DEBTOR. As discussed below, this intra-contract netting process is better characterized as recoupment, not setoff.

A setoff involves claims arising out of two different transactions. *Matter of Holford,* 896 F.2d 176, 178 (5th Cir. 1990). Recoupment involves offsetting obligations that arise out of the same transaction. *Id.* The bankruptcy estate's interest is subject to a creditor's right of recoupment. *In re Azevedo,* 497 B.R. 590, 596 (Bankr.D.Idaho 2013); *In re Madigan,* 270 B.R. 749, 754 (9th Cir.BAP 2001); *In re Chapman,* 265 B.R. 796, 807 (Bankr.N.D.Ill. 2001). Recoupment is not subject to the requirement of section 553 of the Bankruptcy Code that both debts arise before bankruptcy. *In re Anes,* 195 F.3d 177, 182 (3d. Cir. 1999). Thus, recoupment transcends the filing of a petition and allows a creditor to offset a prepetition debt with a mutual postpetition debt. *In re Barrett,* 410 B.R. 113, 122 (Bankr.S.D.Fla. 2009).

To the extent that Michlig itself has incorrectly characterized as a "setoff" its process of terminating and settling, by netting, the January 6, 2010 contract, that error is of no consequence at this stage of the litigation. The proper label to be given a transaction –

15

setoff, recoupment, or something else – is a question of law for the court. A party's innocent mistake of law made at a pretrial stage, that does not involve any misrepresentation of fact, does not result in an estoppel or a waiver. *Vitt's Estate v. U.S.*, 706 F.2d 871, 874 (8th Cir. 1983).

Assuming Stoller's testimony is correct, this case thus involves both recoupment and setoff. Michlig's proposed offset of the $21,173.95 resulting from the nondelivery of grain under the January 6, 2010 contract is in the nature of a recoupment. Its proposed offset of $14,700 resulting from the settlement of the December 1, 2009 contract is the nature of setoff.

Likewise, Michlig's statements or beliefs about when its "right of setoff" arose, made during discovery, do not amount to an estoppel. Whether an obligation arose before or after the petition date, for purposes of sections 553 and/or 556, is for the Court to determine. At this point, nothing has been decided, and in light of this Opinion, it is likely that further discovery will ensue.

Adding further confusion to this matter, the parties spend a great deal of time and effort arguing about the federal Food Security Act of 1985 (FSA), 7 U.S.C. § 1631. Under the FSA, buyers of farm products, including grain, take ownership of the grain free of a security interest created by the seller even if the interest is perfected and the buyer is aware of it, unless the secured party complies with the notice requirements set forth in the FSA. Where notice is properly given, the buyer must cause payment to be made to the secured party, else the lien follows the grain, thereby giving rise to the double liability for the buyer

that the FSA was intended to prevent. *See Matter of McDonald,* 224 B.R. 862 (Bankr.S.D.Ga. 1998). SBT does not dispute that its notices sent to Michlig did not meet the content requirements of the FSA.

The FSA determines whether a buyer of grain takes free or subject to a security interest created by the seller. Whether the buyer takes free or not, however, the secured party still has a lien on the identifiable proceeds of its collateral. 810 ILCS 5/9-315(a)(2). SBT is not asserting a lien on the grain purchased by Michlig in October, 2010. It is asserting a lien on the receivable due from Michlig as the identifiable proceeds of its collateral.[12] Rights to proceeds of collateral are determined by Article 9 of the U.C.C., not by the FSA. *McDonald,* 224 B.R. at 868. The FSA has no applicability to a claim against proceeds and does not affect the ability of a secured party to reach proceeds from the sale of farm products. 1 SECURITY INTERESTS IN PERSONAL PROPERTY § 25:26 (Eldon H. Reiley, ed.). The Court fails to see how the FSA has any relevance to this dispute.[13]

Finally the parties do not adequately address the effect of § 9-404 of the Illinois Commercial Code as it relates to Michlig's attempt to offset the amount owed by the DEBTOR from the December 1, 2009 contract against the larger sum Michlig owed under the January 6, 2010 contract. Michlig contends that there is nothing in the record that establishes that its setoff rights do not arise from a single transaction. In other words, Michlig asserts that the two grain contracts are parts of one transaction. Nothing in

---

[12]Since the amount due from Michlig for the grain has not yet been determined, Michlig is not at risk of having to pay twice. Additionally, while SBT's lien attaches to the receivable or contract right owned by the DEBTOR, it does not attach to any funds in the possession of Michlig since a buyer's funds are not "identified" as proceeds until paid out. *McDonald,* 224 B.R. at 867.

[13]The parties argue about the effect of *In re Printz*, 478 B.R. 876 (Bankr.C.D. Ill. 2012)(Gorman, J.), but *Printz* does not address the issue of recoupment.

17

Stoller's testimony, however, supports this assertion, and the contracts on their face contradict it.

Michlig also contends that Judge Gorman misconstrued § 9-404 in *In re Printz,* 478 B.R. 876 (Bankr. C.D. Ill. 2012). This Court disagrees. Judge Gorman thoroughly reviewed the history and purpose of the provision, as well as the case law applying it. 478 B.R. at 885-87. Her review includes the two Seventh Circuit decisions, *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185 (7th Cir. 1990) and *In re Doctors Hosp. of Hyde Park, Inc.,* 337 F.3d 951 (7th Cir. 2003).

From those decisions, it appears clear that § 9-404 applies here, where Michlig is the account debtor, the DEBTOR is the assignor and SBT is the assignee. Under § 9-404(a)(1), a secured party like SBT is subject to the terms of the contract between the assignor and the account debtor including any right of recoupment that the account debtor might have. But under § 9-404(a)(2), other defenses and claims of the account debtor, including a right of setoff, are valid against the assignee only if they accrued before the account debtor receives a notification of the assignment. Here, even though SBT's notice of its security interest in the DEBTOR'S crops was deficient for FSA purposes, it may satisfy the less stringent requirements of § 9-404(a)(2).[14] If so, Michlig would not be entitled to offset the DEBTOR'S liability under the December 1, 2009 contract in the amount of $14,700. *See Bank of Waunakee,* 906 F.2d at 1191. In that event, section 553 would have no application to this matter.

The cross-motions for summary judgment must be denied. This Opinion constitutes

---

[14]The parties do not address this issue in their arguments.

18

this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate Order will be entered.

###